**O. V. HANDY BROS. CO. et al. v. WALLACE, Secretary of Agriculture, et al.**

No. 9295.

District Court, E. D. Pennsylvania.

Oct. 9, 1936.

Schnader & Lewis, of Philadelphia, Pa., for plaintiffs.

Walter L. Rice, Sp. Asst. to the Atty. Gen., John Dickinson, Asst. Atty. Gen., Wendell Berge, Sp. Asst. to the Atty. Gen., J. Stephen Doyle, Jr., and John A. Skiles, both of Washington, D. C., Sp. Attys., and Charles D. McAvoy, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., for defendants.

Sur Pleadings and Proofs.

KIRKPATRICK, District Judge.

The plaintiffs, who are engaged in various branches of the poultry business in the city of Philadelphia, brought this suit in equity for an injunction to restrain the enforcement of the Amendment of August 14, 1935 (relating to live poultry dealers and handlers) to the Packers and Stockyards Act, enacted as title 5 of that act (7 U.S.C.A. § 218 et seq.). The consitutionality of the amendment is attacked, upon the grounds that it contains an unlawful delegation of legislative power to the Secretary of Agriculture and that it transgresses the Commerce Clause.

Summarized, the pertinent provisions are that the Secretary of Agriculture is authorized and directed to designate cities where "various unfair, deceptive, and fraudulent practices and devices" exist. Thereafter, all persons in the designated area are forbidden to engage in any service or facility in connection with the handling in interstate commerce of live poultry, unless they first obtain licenses from the Secretary of Agriculture, who may require information and may determine the fitness of any applicant for license. By section 202 of the Packers and Stockyards Act (7 U.S.C.A. § 192), which title 5 (7 U.S.C.A. § 218 et seq.) makes applicable to the poultry industry, a number of specific business practices are set out in detail and forbidden. Section 505, tit. 5 (7 U.S.C.A. § 218d), provides that violations of any of these specific provisions shall result in loss of license. Section 502 of title 5 (7 U.S.C.A. § 218a) imposes a fine or imprisonment upon any person engaging in transactions in interstate commerce in the poultry business without a license.

The effect of the act, therefore, upon any one of these plaintiffs is this: If he does not buy, sell, etc., or handle poultry in interstate commerce, the act does not touch him. If he is engaged in interstate transactions, he must apply for a license under the alternative penalties of going out of the business or of subjecting himself to fine or imprisonment. He may or may not be granted a license. If he is refused he may of course have recourse to the courts for a review of such refusal. If he obtains his license, he must thereafter abstain from all the practices forbidden by section 202 of the Packers Act (7 U.S.C.A. § 192), and must also submit to regulations as to rates, charges, keeping of records, etc. If he fails to do so, he loses his license and consequently his right to do business.

On January 6, 1936, the Secretary of Agriculture made an order designating the city of Philadelphia as a city where unfair practices, etc., exist. In order to dispose now of one phase of the case, I find as a fact that this order was made after an investigation and hearing, was not arbitrary or capricious, and was a bona fide and informed exercise of the discretion vested in the Secretary of Agriculture by the Act.

Thereafter, two representatives of the Department of Agriculture came to Philadelphia and met with certain of the poultry dealers including some of the plaintiffs. At this meeting the statement was made by one of the Department's representatives that, "Everybody in the business would

have to get a license." Blank forms of application were sent to persons engaged in the business, including the plaintiffs.

On February 17 the plaintiffs brought this suit for injunction.

On March 6 the Secretary of Agriculture issued a notice to the Philadelphia poultry trade in which it was specifically stated that he would not require licenses from any person not engaged in interstate commerce. In addition, through his counsel he has asserted at the hearing that no person not engaged in interstate commerce will be required to take a license or be prosecuted in the event of failure to do so.

I do not regard the question of constitutionality under the Commerce Clause (article 1, § 8, cl. 3) as now before the court. The act limits itself to persons handling, etc., poultry "in" interstate commerce. It is not an act which necessarily deals with transactions which are intrastate. It must be conceded that some poultry dealers in Philadelphia are engaging and will engage in some transactions in interstate commerce. As to such persons and such transactions the act may lawfully apply.

The line beyond which the act itself does not propose to go is more sharply drawn than it would have been if the phrase used had been "affecting interstate commerce." There is consequently no occasion at the present time to attempt to apply to any specific instance the distinction, discussed in Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, between transactions directly affecting interstate commerce and those which indirectly affect it.

If it were the fact that the Secretary of Agriculture is proceeding to transgress the act itself and to apply it to objects of intrastate commerce which it does not in terms cover, a different question would be presented. The only evidence to this effect is the testimony of two or three of the plaintiffs as to certain general statements made by an agent of the Department. In view of the Secretary's official notice to the poultry trade of March 6, 1936, and of the statement of counsel, I do not think the record justifies a finding that he proposes to apply the act to any but interstate transactions.

So far, nothing has been actually accomplished to put the act into operation beyond the designation of Philadelphia as a city where unfair, deceptive, and fraudulent practices exist. In the .event that there should be an attempt to extend the penalties of the act to persons or transactions not within its terms, the question, whether injunctive relief is proper or whether a defense to the penalty proceeding is the only remedy, is one which will probably have to be met at that time. As it is, no opinion is now expressed.

The other ground upon which the act is attacked is that of unconstitutional delegation of legislative power. In reviewing the cases in which the courts have had occasion to deal with this question, we find a considerable variety in the extent to which such power has been delegated as well as in the method of its exercise.

At one extreme stands the scheme of the National Industrial Recovery Act, 48 Stat. 195, condemned in the Schechter Case, in which the whole of the lawmaking power was handed over to the President. He was authorized, not only to say when or whether the law should become effective, but to say what the terms of the law should be, guided only by the term "fair competition" as expressed in the declared purpose of the act.

At the other extreme stands the type of legislation in which Congress made the law, but provided that it should go into effect only when certain conditions arose or a certain fact came to exist. The only thing delegated was the power or duty of finding and declaring the existence of the fact which would put the law into operation. Instances of this kind are to be found in The Brig Aurora, 7 Cranch, 382, 3 L.Ed. 378; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; Hampton, Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

Between these two kinds of delegations there are a number of cases in which Congress exercised its legislative function, that is, enacted a law or a code sufficiently complete and definite to be within its other constitutional powers, and then conferred upon an administrative officer a certain measure of discretion, going beyond merely finding a fact and resulting in vesting in him to some extent the power to determine whether or when the law shall go into effect. His freedom of action was generally subject to control or guidance in degrees, varying with the different acts, by a declaration of legislative policy. The

question in such cases is: Do the necessities of the kind of legislation to be enacted justify the measure of delegation? Or, to put it in another way: Has Congress itself exercised the power to legislate to the fullest extent reasonably practicable in view of the ends to be obtained? See Vogt & Sons v. Rothensies (D.C.) 11 F.Supp. 225.

In Panama Refining Company v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, the discretionary power vested in the President was entirely unfettered. The law itself was plain and definite. It prohibited interstate shipment of oil produced in violation of any state law. But the President was entirely free to decide when it should become effective or whether it should ever become effective at all. The Supreme Court decided that a delegation of this unlimited character was unconstitutional. Whether and to what extent a discretionary power limited in terms by a declaration of legislative policy may be sustained was not decided. The court examined the act in question and the majority found in it no such declaration.

Returning now to a consideration of the act of Congress which this case brings before us, it is plain that there is no delegation to legislate which is in any way comparable to that which was before the Supreme Court in the Schechter Case, and it follows that the discussion in the part of the opinion which deals with delegation is inapplicable. In the present case the forbidden acts and practices are specified in detail in section 202 of the Packers and Stockyards Act (7 U.S.C.A. § 192). Whatever general regulatory power is conferred by section 305 to 316 and 401 to 404 of that act (7 U.S.C.A. §§ 206 to 224) is of a kind which has been fully sustained in St. Louis, I. M. & S. R. Co. v. Taylor, 210 U.S. 281, 28 S.Ct. 616, 52 L.Ed. 1061, United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563, and other decisions, and, inferentially in connection with the Packers and Stockyards Act (7 U.S.C.A. § 181 et seq.), in Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

It seems equally plain that what was actually decided in the Panama Refining Company Case does not reach the point here. Since there was no limit whatever to the discretion conferred in that case, it was not determined what degree of limitation was needed to make the delegation valid. In the present case there may be some degree of discretion involved in the selection of the area in which the act is to become effective, but it will be noted that the Secretary is not merely authorized but is directed from time to time to ascertain the cities where unfair practices exist and then to designate them. This appears rather plainly to place a duty upon the Secretary to inaugurate a program of investigation of the various centers of the poultry trade in order to subject the proper ones to the act—a thought which is implicit in the command to ascertain, which is added to the mere authority to designate.

But this discussion may be somewhat beside the point, for I think the controlling decisions are those in which the delegation was that of a duty to ascertain the existence or nonexistence of a fact, upon which the law, enacted by Congress, automatically became operative, of which the Flexible Tariff Case (Hampton, Jr., & Co. v. United States) is an example.

The plaintiff, however, argues in effect that, since "unfair, deceptive, and fraudulent" are terms of rather general and indefinite meaning, the ascertainment of a situation to which they could apply is not really a fact finding at all, but amounts to the exercise of a purely discretionary power. If this were correct, then it would have to be conceded at least that they constitute the epitome of a declared policy and we would have to determine whether that policy was sufficiently defined in the act to sustain the delegation.

But I do not agree that these terms are so indefinite no fact finding can be made under them. The plaintiff refers to the opinion in the Schechter Case, but, when the Supreme Court in that case discussed the effect of the words "unfair competition," it was not dealing with the phrase in the relation in which it appears in this act. See page 533 of 295 U.S., page 844 of 55 S.Ct. What was held in the Schechter Case was that those words were too broad and general to serve as the framework for a code of laws which the President, not Congress, was to make—that they were not an adequate contribution on the part of Congress to the performance of the legislative function. The words, even in their broader or statutory sense, have been held not too vague to be the basis of a finding by the Federal Trade Commission. Federal Trade Commission

v. Raladam Company, 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191. See cases cited Schechter Poultry Corp. v. U. S., 295 U.S. 495, 532, 55 S.Ct. 837, 844, 79 L.Ed. 1570, 97 A.L.R. 947. And I do not think that they are too general to be susceptible of fact finding under the present act.

I therefore hold that the act in question does not contain an unconstitutional delegation of legislative power.

What has been said makes it unnecessary to discuss what would otherwise be a serious question in the case, namely, the right to equitable relief at the present time.

The statements of fact made in this opinion may stand as special findings of fact and the statements of law as special conclusions, under Equity Rule 70½ (28 U.S.C.A. following section 723).

The bill may be dismissed.